UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICOLE CASANOVA,

      **Plaintiff,**       Index No._____

                 **COMPLAINT**

     **- against -**

OMEGA INSTITUTE FOR HOLISTIC
STUDIES, INC.;
ELISABETH GIGLIO, *individually;* and
ROBERT BACKUS, *individually.*

     **Defendants.**

---

Plaintiff, **NICOLE CASANOVA**, through her attorneys, Gail I. Auster & Associates,

P.C., as and for her Complaint, alleges as follows:

<u>Preliminary Statement</u>

  1.  This is a case brought by the Plaintiff, Nicole Casanova, against Defendants

Omega Institute for Holistic Studies, Inc., et al, to remedy discrimination and retaliation in the

terms, conditions, and privileges of Casanova's employment on the basis of sex in violation of

Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. ("Title

VII").

  2.  This case is also brought to remedy discrimination and retaliation in the terms,

conditions, and privileges of Casanova's employment on the basis of sex in violation of the New

York State Human Rights Law, New York State Executive Law § 296(1)(a) ("NYSHRL").

  3.  This case is also brought to recover minimum wages earned by Plaintiff during

the period when she worked for Defendant Omega, as well as statutory damages, pursuant to the

Fair Labor Standards Act, 29 U.S.C. ¶ 201, <u>et</u> <u>seq</u>., ("FLSA").

1

4.      This case is also brought to recover minimum wages earned by Plaintiff during the period when she worked for Defendant Omega, as well as statutory damages, pursuant to the New York Labor Law ¶ 190, et seq., ("NYLL").

## Jurisdiction and Venue

5.      Jurisdiction of this Court is proper pursuant to 29 U.S.C. § 2617 and pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as the parties are domiciled within the Southern District of New York, and the acts complained of occurred therein.

8.      The EEOC's 90 day Right to Sue letter to Plaintiff is postmarked August 10, 2015, and was received on August 12, 2015, attached hereto as Exhibit 1.

9.      Plaintiff has served this complaint upon the New York State Attorney General.

## The Parties

10.      Plaintiff Nicole Casanova ("Casanova" or "Plaintiff") was employed by Defendant Omega Institute for Holistic Studies, Inc., at its campus in Rhinebeck, New York, as a Faculty Support Coordinator from April through August 3, 2014, and resided on the Rhinebeck campus throughout that time.

11.      Since Casanova's employment terminated, she has resided her home in Brooklyn, NY.

12.      Defendant Omega Institute for Holistic Studies, Inc., ("Omega" or "Defendant Omega") is a New York corporation in the business of providing classes and programs in Yoga

and other disciplines for the purpose of "awakening the best in the human spirit," according to *http//www.eomega.org*, and has a "campus" located at 150 Lake Drive, Rhinebeck, NY 12572.

13.     Defendant Robert "Skip" Backus ("Backus" or "Defendant Backus") is and was, at all times relevant to this action, the Chief Executive Officer ("CEO") of Defendant Omega.

14.     Defendant Elisabeth Giglio ("Giglio" or "Defendant Giglio") was, at all times relevant to this action, the Assistant Director of Defendant Omega's "People and Culture Department" ("HR").

15.     At all times relevant, Plaintiff was an "employee" within the meaning of the FLSA, the NYLL, Title VII and NYSHRL.

16.     At all times relevant, Defendants Omega and Backus, individually, were employers within the meaning of the FLSA and the NYLL.

## Summary of the Facts

17.     Casanova, a woman, was employed as a Faculty Support Coordinator by Omega from March 31, 2014 through July, 2014.

18.     In her role as Faculty Support Coordinator, Casanova's job duties primarily consisted of handling all pre-event planning with Omega's catalog faculty, supporting teachers prior to arrival, and hosting them during their time on campus.

Omega's Failure to Pay Minimum Wage

19.     Defendant Omega employs more than 15 employees; in fact, Omega employs over 200 seasonal staff member each year, plus permanent year-round employees.

20.     Defendant Omega grosses more than $500,000 per year; in fact, in 2013, Omega's total tuition income was $ 6,997,813, its total housing income was $6,373,611 and its total operation and maintenance sales were $19,533,676.

*http://www.eomega.org/sites/default/files/resources/economic_and_fiscal_impact_analysis_of_th
e_omega_institute_2014.pdf.*

21.     At Omega, "[d]uring the season, nearly 1,800 exclusive community classes are

available." *http://www.eomega.org/seasonal-community-experience.*

22.     Such programming ranges in price from approximately $300-400 for a two-day

workshop, approximately $1,000 for a five-day course and approximately $1,900 for a seven-day

retreat.

23.     On-campus accommodations for participants range in price as follows:

| Per Person Rates | 2-night | 3-night | 5-night* | 7-night | 26-night** | 28-night** |
|---|---|---|---|---|---|---|
| Deluxe Double Cabin Room A | $574 | $799 | $1125 | $1575 | $4888 | $5264 |
| Single Cabin Room A | $672 | $931 | $1295 | $1813 | $5694 | $6132 |
| Couple's Cabin Room A | $480 | $660 | $900 | $1260 | $3874 | $4172 |
| Double Cabin Room A | $518 | $716 | $990 | $1386 | $4160 | $4480 |
| Single Cabin Room B | $558 | $775 | $1085 | $1519 | $4706 | $5068 |
| Double Cabin Room B | $416 | $574 | $790 | $1106 | $3328 | $3584 |
| Dorm Single | $348 | $481 | $665 | $931 | $2938 | $3164 |
| Tent Cabin Single | $346 | $481 | $675 | $931 | $3198 | $3444 |
| Tent Cabin Double | $262 | $365 | $515 | $721 | $2262 | $2436 |
| Camping | $216 | $300 | $420 | $588 | $1976 | $2128 |
| Commuter/Facility Fee | $100 | $135 | $175 | $245 | $650 | $700 |

24.     Omega seasonal staff such as Faculty Support Coordinators, inter alia, live on

campus and work 40 hours per week or more for at least six consecutive months, in exchange for

on-campus housing, meals and a stipend of $100 per week, in biweekly payments.

25.     Therefore, the gross hourly wage of Omega seasonal staff members, including

Casanova, was $2.50 per hour.

26.     Upon information and belief, at all times relevant, seasonal staff members were not properly notified of the amount of their wages deducted for either meals and housing.

27.     The on-campus housing that Omega provided to Casanova was a small trailer that often lacked heat and/or electricity.

28.     The lack of heating in Casanova's trailer included, but was not limited to, several nights in the Spring of 2014 when the temperature dipped below 32 degrees.

Initial Harassment and Stalking

29.     During the period of her employment at Omega, Casanova was repeatedly stalked and sexual harassed by another Omega seasonal employee, Richard Brzuszkiewicz, a.k.a. "Rishi Bruke" ("Brzuszkiewicz").

30.     Despite her repeated complaints to Omega management, Omega failed and refused to take effective remedial action to stop Brzuszkiewicz from sexually harassing and stalking Plaintiff – conduct which has continued even after her employment at Omega ended.

31.     During the first week of April 2014, Brzuszkiewicz began speaking to Casanova about his love of tantric sexuality.

32.     Over the course of this week, Brzuszkiewicz's talk of tantric sexuality included him sexually propositioning Casanova by asking her to engage in *yoni* and *lingham* genital massage with him.

33.     Casanova told Brzuszkiewicz unequivocally that she was not interested in engaging in any sexual acts with him.

34.     On April 17, 2014, Casanova's brother was tragically killed in an accident, and she left the Omega campus from April 22-30, 2014, in order to mourn with her family.

35.     When Casanova returned to the Omega campus on or about May 1, 2014, and Brzuszkiewicz again repeatedly insisted that she engage in *yoni* and *lingham* genital massage with him, this time while she was grieving the recent loss of her brother.

36.     On or about May 1, 2014, Brzuszkiewicz showed Casanova a "bed" of pine-needles that he had constructed in a wooded area and told her that this was the bed upon which the two of them would perform tantric genital massage upon one another.

37.     In reply, Casanova expressed that she was not interested in sharing a bed with him and that she was not interested in doing tantric genital massage with him.

38.     Between the first week of April, 2014 and June 17, 2014, when Casanova first reported his conduct to Omega's HR department, Brzuszkiewicz engaged in a  continuous course of sexual harassment and stalking, including but not limited to the following:

39.     Brzuszkiewicz made repeated and unwelcome romantic declarations to Casanova, including but not limited to "I love you," telling her that the two of them were "soul mates" and "twin flames," saying that Casanova was his "perfect mirror," and remarks about the universe having sent Casanova to him.

40.     Brzuszkiewicz repeatedly brought unwelcome and inappropriate gifts, which he called "offerings," to Casanova's dwelling, including but not limited to books about tantric sex and genital massage, flowers, and food from the community kitchen.

41.     Casanova returned the books about tantric sex and genital massage to Brzuszkiewicz, telling him unequivocally that she was not interested in practicing tantric sex or genital massage with him.

42.     Upon information and belief, on several occasions, Casanova's neighbors observed Brzuszkiewicz lurking around Casanova's dwelling when Casanova was not there.

43.     Upon information and belief, in May, 2014 Brzuszkiewicz also told over a dozen co-workers at Omega that he had spied on Casanova and her boyfriend at that time, Tyler Epps ("Epps"), while they were "having sex" in Casanova's trailer.

44.     Brzuszkiewicz's behavior regarding this incident made her feel extremely violated.

45.     Brzuszkiewicz continued to harass Casanova on campus, and Casanova continued to tell Brzuszkiewicz to leave her alone, that the two of them were not friends and that Casanova wanted him to stay away from her, to no avail.

46.     In May, 2014, Brzuszkiewicz spread false sexual rumors about Casanova to other staff members at Omega, including but not limited to claiming that the two of them were in love with one another and had in fact already been practicing sacred sexual rituals and "sex magic" together.

47.     On May 24, 2014, Casanova told Brzuszkiewicz via private Facebook message that she was hurt and upset that he had falsely had told their coworkers that the two of them were in love and practicing tantric sexual rituals together.

48.     On or about May 26, 2014, Brzuszkiewicz sent Casanova an unwelcome email of a romantic nature.

49.     On or about May 26, 2014, Casanova sent a reply email to Brzuszkiewicz telling him she was deeply hurt by the things he had said about her and Epps to their co-workers, told him to stop talking about her and Epps to their co-workers, and expressed concern about her "safety."

50.    Brzuszkiewicz's repeated uninvited and unwelcome visits to Casanova's personal dwelling, which was a trailer provided by Defendant on Omega's Rhinebeck campus, continued throughout the Spring and Summer of 2014.

51.    Brzuszkiewicz appeared at Casanova's dwelling dressed in nothing but a robe with a vine tied about the waist, and informed her that he was nude underneath because he had just been swimming in the nude. He then said he was on his way to the dining hall, and when Casanova asked him if he was planning to get dressed first, he said "I do whatever I want."

52.    On or about the night of June 16, 2014, Casanova returned to her dwelling to find Brzuszkiewicz lurking in the darkness beside her trailer, which frightened her.

53.    Casanova told Brzuszkiewicz that he should not be there and told him to leave immediately.

54.    Brzuszkiewicz refused to leave and told Casanova he was "making an offering at [her] altar."

55.    Casanova told Brzuszkiewicz again to leave immediately, but he again refused to leave and told her he had put a "Herkimer diamond" in her drinking water, which she stored in a large container outside her dwelling, in order to "purify" her.

56.    Casanova found, upon closer inspection, that Brzuszkiewicz had actually placed rocks in her supply of drinking water without her knowledge or consent, which she found intrusive, dangerous and upsetting.

57.    Brzuszkiewicz remained at Casanova's trailer for approximately 15 minutes after she had asked him to leave, which she experienced as extremely harassing and menacing.

Casanova Reports Harassment to Omega Management

58.     At breakfast the next day, on or about June 17, 2014, Casanova reported this incident and all other relevant incidents to Omega Staff Manager Turner Dubler ("Dubler"), who was Casanova's supervisor.

59.     That same day, Casanova also gave Dubler print-outs of the emails that Brzuszkiewicz had sent her.

60.     Upon information and belief, Dubler then reported this information to his supervisor, Director of Operations Holly VanLeuvan and spoke to HR Assistant Director Lis Giglio ("Giglio") about Brzuszkiewicz's conduct on Casanova's behalf.

61.     Dubler returned to Casanova that day and said that Giglio had told him that if there was a problem, Casanova had to go to HR directly.

62.     Upon information and belief, the 2014 seasonal staff were not issued a detailed written employer policy against sexual harassment by Omega.

63.     Upon information and belief, there was no seasonal staff training on sexual harassment in the workplace during that season of March – October, 2014.

64.     Casanova therefore went to the HR office on June 17, 2014 and reported to HR Manager Tami Stephan ("Stephan") that Brzuszkiewicz had been harassing and stalking her, detailing his repeated and unwelcome conduct as described above.

65.     At some point, Giglio also joined the June 17th meeting.

66.     Stephan told Casanova that HR did not have time to deal with her complaint.

67.     Rather than remediate the harassment by dealing with Brzuszkiewicz directly, Stephan then told Casanova that she could move her housing.

68.     Casanova told Stephan and Giglio that it was inappropriate and offensive for HR to suggest that *she* move, as though *she* was the one who had done something wrong, since she was in fact the one who was being harassed.

69.     Stephan also said that Omega uses a "progressive discipline" system and that as part of that system HR was setting progressive discipline guidelines for *their* interactions going forward, as though Casanova was deserving of discipline and as though they were jointly responsible for Brzuszkiewicz's sexually harassing and menacing behavior directed towards her.

70.     The progressive discipline guidelines given to Casanova by HR included telling Casanova to avoid Brzuszkiewicz as much as possible.

71.     HR told Casanova that these progressive discipline guidelines were intended to be mutual between Casanova and Brzuszkiewicz, that HR would tell Brzuszkiewicz to avoid Casanova on campus, and that Casanova and Brzuszkiewicz should mutually refrain from talking about one another to other members of the Omega community.

72.     The progressive discipline guidelines given to Casanova by HR were not in writing, but HR stated that Brzuszkiewicz would be made aware of these mutual progressive discipline guidelines.

73.     Casanova told Stephan and Giglio that it was Brzuszkiewicz, and not Casanova, who should be disciplined.

74.     Giglio then asked Casanova "what do you want?" and Casanova stated that Omega should terminate Brzuszkiewicz's employment due to his ongoing sexual harassment of her.

75.     Giglio seemed shocked by the suggestion that Brzuszkiewicz should be terminated for sexual harassment, and she exclaimed that "taking someone out of their community is a really big deal!"

76.     Giglio then suggested that Casanova take a brief leave of absence from Omega.

77.     HR did not terminate Brzuszkiewicz's employment at that time.

78.     HR did not move Brzuszkiewicz's housing location.

79.     HR did not suggest that Brzuszkiewicz take a leave of absence.

80.     Upon information and belief, HR did not properly investigate Casanova's complaint.

81.     Shortly after this meeting with Stephan and Giglio in the HR "People and Culture" office, Casanova encountered her manager, Faculty Support Supervisor Gillian Arthur ("Arthur"), in one of the Omega classrooms, and Casanova explained the situation with Brzuszkiewicz to Arthur on a bench outside the classroom.

82.     Arthur told Casanova during this discussion that she was generally aware of Brzuszkiewicz's bizarre conduct, and that Casanova should take a few days away from campus in order to digest all that had had happened and come back when HR had more time for Casanova's complaint.

83.     Casasnova therefore took a brief leave of absence per HR's suggestion, from June 17 to 22, 2014, thereafter returning to campus.

84.     Upon information and belief, in or about late June, 2014, in direct violation of his progressive discipline guidelines, Casanova learned from a neighbor that Brzuszkiewicz continued to appear at Casanovas trailer during times when she was not home.

85.     On one such incident, Brzuszkiewicz encountered a guest of Casanova's directly outside of her trailer and began telling Casanova's guest that Casanova was "vampire mistress" who was sucking his energy.

86.     On July 1, 2014, Brzuszkiewicz sent Casanova another email of a romantic nature, after HR had allegedly instructed him not to contact Casanova again per their progressive discipline guidelines.

87.     On or about July 1, 2014 Casanova learned from her coworkers that Brzuszkiewicz had breached the progressive discipline guidelines that Omega allegedly had given him by talking about her obsessively to co-workers, to the point of disturbing his co-workers' work, including but not limited to spreading a new and entirely false sexual rumor about Casanova, i.e., that she had bitten him and left marks in his flesh.

Casanova Again Reports Harassment to Omega Management

88.     On or about July 1, 2014, Casanova called HR Manager Stephan and urgently requested a meeting with HR to discuss the ongoing sexual harassment and Brzuszkiewicz's breach of the progressive discipline guidelines.

89.     In response, Stephan told Casanova once again that HR did not "have time to deal with this right now" because new staff orientation was taking place, and that HR would not be able to address Casanova's concerns for several more days.

90.     Casanova replied that she did not feel safe and that she needed to meet with HR as soon as possible, but Stephan insisted that HR did not have time to address Casanova's concerns.

91.     On that same day, Casanova emailed HR, protesting HR's lack of urgency in responding to her complaints of sexual harassment, and reiterating to HR that she was afraid for her safety.

92.    In response, Stephan agreed to meet with Casanova later that day; at this meeting, Stephan told Casanova for a third time that HR was not able to address her concerns about sexual harassment at that time.

93.    The following day, on or about July 2, 2014, Casanova had a longer meeting with HR Manager Stephan and HR Assistant Director Giglio regarding Brzuszkiewicz.

94.    During this meeting, Casanova again reported the sexual harassment that she had already reported through her prior complaint to HR, and added the new information about Brzuszkiewicz having broken his progressive discipline guidelines by spreading the new rumor that she had bitten him and left marks in his flesh, and, upon information and belief, by continuing to lurk around her trailer when she was not home, according to Casanova's neighbors.

95.    During this meeting, Casanova also gave HR copies of Brzuszkiewicz's unwelcome romantic emails to her, including the most recent one from July 1, 2014.

96.    Instead of disciplining Brzuszkiewicz or dealing with him directly, HR responded by telling Casanova again that she could move her housing, which was offensive to her because, in addition to being insufficient remediation, it was a form of blaming the victim.

97.    Casanova once again told Stephan and Giglio that moving her housing was not appropriate or effective remedial action, and Casanova also said that she was upset that HR would not do more to protect her from Brzuszkiewicz's harassment.

98.    In response, Stephan and Giglio suggested that Casanova take another leave of absence from Omega.

99.    For lack of any other action on HR's part, Casanova agreed to take another brief leave of absence for approximately three days.

Omega's Failure to Remediate the Sexual Harassment and Stalking

100.     After Casanova had returned from this second leave of absence, she gave her notice of resignation to Faculty Support Supervisor Arthur on or about July 7, 2014, because, due to the ongoing sexual harassment and stalking on the campus where she lived and worked, her work situation had become unbearable.

101.     In the spirit of service and cooperation, Casanova gave advance notice so as to provide Omega with time to find and train a replacement for her, as she was still hosting various faculty members.

102.     Approximately one day after Casanova had given notice of her resignation, on or about July 8, 2014, HR proposed a "mediation" between Brzuszkiewicz and Casanova.

103.     Casanova did not want to be in the same room as Brzuszkiewicz, and she felt that this so-called "mediation" was not prompt or effective remedial action; nonetheless, upon HR's urging this course of action, Casanova agreed to attend the "mediation."

104.     In or about mid-to-late July 2014, Casanova attended a "mediation" session in the HR office with Brzuszkiewicz, Stephan, Giglio and Tyler Epps, who was Casanova's coworker and boyfriend at the time.

105.     Upon information and belief, neither Stephan nor Giglio had any mediation training.

106.     After opening the mediation, Giglio gave Casanova the first opportunity to speak; Casanova repeated her allegations of sexually harassing conduct directly to Brzuszkiewicz and asked him why he had persistently engaged in such conduct, even after she and HR had told him to stop.

107.     Giglio then invited Brzuszkiewicz to respond.

108.    Brzuszkiewicz did not deny Casanova's allegations or explain his actions; instead, Brzuszkiewicz said: "I love you."

109.    Neither Giglio nor Stephan asked Brzuszkiewicz to explain himself or provide any comment regarding Casanova's allegations.

110.    When Epps asked Brzuszkiewicz why he had told their co-workers that Casanova had bitten him, Brzuszkiewicz initially denied having spread this rumor. Epps then pointed out that Brzuszkiewicz had told Epps that rumor directly, at which point Brzuszkiewicz admitted that he had spread the rumor.

111.    Epps expressed frustration with HR's failure and refusal to hold Brzuszkiewicz accountable in any way for sexually harassing Casanova, told Giglio and Stephan that they were responsible to help protect Casanova from sexual harassment, especially because Brzuszkiewicz had violated his progressive discipline guidelines, and said to Giglio and Stephan: "You need to do something!"

112.    At some point during the mediation, Brzuszkiewicz said "I'm sorry" for all of the conduct which Casanova had complained of.

113.    After Brzuszkiewicz left the HR office, Casanova told Giglio and Stephan that she was still very upset about both the sexual harassment and Omega's utter failure to remediate it or hold Brzuszkiewicz accountable for his conduct toward her.

114.    Giglio then asked Casanova, again, "what do you want?" and Casanova again stated that Omega should terminate Brzuszkiewicz's employment due to his ongoing sexual harassment of her, up to and including breaching the progressive discipline guidelines that Omega had allegedly set for him.

115.     Giglio told Casanova that there was not enough evidence against Brzuszkiewicz and that the investigation was ongoing, despite the fact that Brzuszkiewicz had not denied Casanova's claims, even when given a chance to explain himself during the mediation, had admitted to having spread the rumor that she had bitten his flesh, and had apologized for all his conduct, which was tantamount to an admission.

116.     Giglio then said that HR was still working with Brzuszkiewicz on his progressive discipline guidelines.

117.     Casanova asked Giglio why HR was still working with Brzuszkiewicz on his progressive discipline guidelines, given the fact that he had violated the guidelines repeatedly.

118.     Giglio responded that the People and Culture department had its own way of handling these situations.

119.     Giglio therefore did not terminate Brzuszkiewicz's employment at that time or take other effective remedial action.

120.     HR did not hold Brzuszkiewicz responsible for breaching his progressive discipline guidelines, and did not impose any discipline, progressive or otherwise, upon Brzuszkiewicz for his breaching the progressive discipline guidelines.

121.     After the "mediation" had concluded, Casanova and Epps went to the office of Chief Operations Officer Lois Guarino ("Guarino").

122.     Casanova and Epps then gave CEO Guarino a detailed account of Brzuszkiewicz's ongoing sexual harassment of Casanova, as well as HR's failure to remediate it.

123.     After listening to Casanova's account, Guarino told Casanova and Epps that Casanova's repeated complaints about Brzuszkiewicz's ongoing sexual harassment of her should have been handled differently by HR.

124.   Epps told Guarino that Omega was responsible to protect its employees from sexual harassment on campus, including Casanova's trailer and yard provided by Omega.

125.   In response, Guarino said words to the effect of "you can call the police, but they can't do anything about it because this is Omega's property, not [Casanova's] property, so it's not trespassing."

126.   Guarino then showed Casanova and Epps Omega's "sexual harassment policy," which was contained in a policy manual that was not distributed to Omega's seasonal staff.

127.   Casanova told Guarino that Omega's sexual harassment policy should have been issued directly to all staff, in order to make all staff aware of the policy.

128.   Guarino replied that Omega would consider doing so in the future.

129.   Upon information and belief, Epps met again with Giglio after the mediation and provided her with a written list of approximately 13 people to whom Brzuszkiewicz had reported he spied on Epps and Casanova while they were "having sex" in Casanova's trailer.

130.   Upon information and belief, HR did not interview these individuals with regard to Brzuszkiewicz's alleged comments about spying on Casanova.

131.   Upon information and belief, HR did not interview Brzuszkiewicz with regard to his alleged comments about spying on Casanova.

132.   Instead, Defendant tolerated Brzuszkiewicz's misconduct and took no further action in response to Casanova's complaints of co-employee sexual harassment.

133.   On or about August 3, 2014, Casanova left the Omega campus over two months ahead of schedule, in order to avoid further harassment by Brzuszkiewicz, and returned to her home in Brooklyn, New York.

134.    Brzuszkiewicz sent Casanova several more emails after she had left Omega, while Brzuszkiewicz was still working at Omega, but Casanova did not respond to any of these emails.

135.    Upon information and belief, approximately one month after Casanova's departure, Omega terminated Brzuszkiewicz's employment for inappropriate conduct with Omega participants.

Continued Stalking as a Result of Omega's Continued Discrimination and Retaliation

136.    In October 2014, after having moved back to Brooklyn, Casanova learned from a mutual acquaintance that Brzuszkiewicz had posted on Facebook that he was moving to Brooklyn in order to be reunited with his "true love."

137.    On October 29, 2014, Brzuszkiewicz sent Casanova an email stating "I can't stop thinking about you" and telling her that he was moving to Brooklyn.

138.    Because she feared further harassment and stalking by Brzuszkiewicz, Casanova wanted to get a restraining order against him in order to protect herself from him.

139.    By email to Giglio dated October 30, 2014, Casanova therefore requested that Omega provide her with a copy of the file detailing Omega's investigation of Brzuszkiewicz regarding Casanova's complaints of sexual harassment.

140.    Casanova stated very clearly in this email that Brzuszkiewicz had moved to Brooklyn in order to follow her, and that she needed a copy of Omega's investigation file in order to obtain a restraining order against Brzuszkiewicz for her safety.

141.    By email dated December 12, 2014 that Giglio informed Casanova that Omega would only send her a "broad statement surrounding the events on campus...we cannot release our internal documents from the investigation as we need to maintain confidentiality in staff issues."

142.    Casanova was very distressed and humiliated to find that Giglio was still protecting Brzuszkiewicz, her sexual harasser, instead of her.

143.    Giglio included in her email an official "statement" that Omega's "investigation" had yielded "insufficient evidence" to terminate Brzuszkiewicz's employment, but that Omega had "imposed guidelines…such as avoiding each other as much as possible on our campus," language that suggested that the two of them were mutually responsible for his sexually harassing Casanova.

144.    By Defendant's refusal to provide Casanova with the investigation notes related to her complaints of sexual harassment, Defendant interfered with her ability to obtain a protective order for her safety.

145.    On or about February 10, 2015, Brzuszkiewicz appeared at Casanova's meditation class at Integrated Sciences of Hatha, Tantra and Ayurveda ("ISHTA") in New York City, which was the yoga studio she attended.

146.    Casanova was very distressed by Brzuszkiewicz's sudden appearance at her yoga class in New York City.

147.    After the class, Brzuszkiewicz tried to engage Casanova in conversation, but she would not allow him to do so.

148.    The owner of ISHTA informed Casanova that Brzuszkiewicz had enrolled in ISHTA's teacher training program in a work-study capacity, and that between his work and his studies, Brzuszkiewicz would be spending a substantial amount of time at ISHTA facilities.

149.    Casanova then told the owner of ISHTA about Brzuszkiewicz's history of sexually harassing, stalking and menacing her, and the owner requested that Casanova obtain the file on this history from Omega for her review.

150.    Casanova then told the owner of ISHTA that Omega had already refused to share this file with her, despite the fact that she had told them that her safety was at risk and she had explained in her email to Giglio that she needed it in order to help her obtain a restraining order against Brzuszkiewicz.

151.    Later that day, Casanova went to her local police precinct, reported Brzuszkiewicz's history of stalking and harassing her, and sought a restraining order; in response, the police told Casanova to obtain a copy of the file detailing Omega's "investigation" of Brzuszkiewicz regarding Casanova's complaints of sexual harassment; however Omega had refused to share these investigation documents with Casanova for this purpose, and she was unable to obtain a restraining order.

152.    ISHTA subsequently informed Brzuszkiewicz that he was not to approach Casanova or attempt to communicate with her on their premises under any circumstances.

153.    However, despite ISHTA's mandate, on or about March 19, 2015, Brzuszkiewicz appeared at Casanova's Yoga class at ISHTA, placed his yoga mat next to hers, and sat next to her for the duration of the class; when the class ended, Casanova hurried out the studio door to get away from Brzuszkiewicz, but he began calling her name and closely following her, insisting: "I have something I need to give you."

154.    Casanova ignored Brzuszkiewicz, but he persisted and began to physically block her from exiting the building until she managed to get past him.

155.    Casanova reported this incident to ISHTA.

156.    On April 6, 2015 Casanova's legal counsel sent a Cease and Desist letter to Brzuszkiewicz, stating clearly and unequivocally that he was to cease all efforts at

communication with Casanova and that he was never to follow, contact or attempt to contact Casanova again under any circumstances.

157.    Nevertheless, on September 20, 2015, despite the Cease and Desist letter as described above, Brzuszkiewicz again emailed Casanova directly.

158.    By Defendant's failure to act to protect Casanova from Brzuszkiewicz's post employment stalking, it again ratified such behavior.

159.    As a result of Brzuszkiewicz's ongoing sexual harassment of Casanova, which continues to the present, Casanova has experienced severe anxiety, depression, nightmares, insomnia, inability to trust others and anxiety about leaving her apartment, lest she be followed by Brzuszkiewicz.

## FIRST CLAIM
### (Title VII – Sex Discrimination)

160.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

161.    As a woman, Plaintiff is a member of a class protected by Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. ("Title VII").

162.    Defendant discriminated against Plaintiff on the basis of sex, in violation of Title VII, including but not limited to creating and maintaining a sex-based hostile work environment, and by failing and refusing to take prompt and effective remedial action in response to Plaintiff's numerous reports of sexual harassment.

163.    Such hostile work environment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

164.    Such hostile work environment constituted a constructive discharge.

165.    Such hostile work environment made Plaintiff's working conditions so intolerable that a reasonable person in her position would have felt compelled to resign.

166.    Such hostile work environment may be imputed to Defendant, as the employer, because Defendant provided no reasonable avenue of complaint for Plaintiff and/or failed to take appropriate remedial action in response to Plaintiff's repeated complaints.

167.    By its conduct, including but not limited to, failing and refusing to provide a reasonable avenue of complaint and/or to take appropriate remedial action in response to Plaintiff's complaints of sexual harassment, Defendant ratified and condoned the perpetrator's behavior, effectively giving him permission to continue.

168.    As a result of such condonation, *inter alia*, the perpetrator followed Plaintiff back to Brooklyn, New York, where he has continued to stalk and harass her up to the present.

169.    Defendant's conduct was intentional as Defendant acted with malice and/or with reckless indifference to Plaintiff's Title VII-protected rights.

170.    As a consequence of its actions, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, attorney's fees, costs and disbursements in this action.

## SECOND CLAIM
### (Title VII – Retaliation)

171.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

172.    Plaintiff opposed discrimination pursuant to Title VII by actions including, but to limited to, the following:

- On or about June 17, 2014, Plaintiff reported Brzuszkiewicz's sexual harassment of her to her supervisor, Omega Staff Manager Turner Dubler.

- On or about June 17, 2014, Plaintiff reported Brzuszkiewicz sexual harassment of her directly to HR.

- On or about July 1, 2014, Plaintiff reported to HR that Brzuszkiewicz had violated the progressive discipline guidelines allegedly given to him by Defendant by spreading sexual rumors about her to other staff members.

- On or about July 1, 2014, Plaintiff emailed HR, protesting their lack of urgency in responding to her repeated complaints of sexual harassment by Brzuszkiewicz.

- On or about July 2, 2014, Plaintiff met with HR in the HR office to report in greater detail the circumstances of Brzuszkiewicz's violation of the progressive discipline guidelines allegedly given to him by Defendant, and to reiterate her prior complaints of sexual harassment by Brzuszkiewicz. During this meeting, Plaintiff turned over to HR the unwanted romantic emails she had received from Brzuszkiewicz including but not limited to those emails he sent even she told him unequivocally to stop contacting her.

- In or about mid-late July 2014, Plaintiff complained again to HR of Brzuszkiewicz's sexual harassment of her.

- Directly after this final meeting with HR, Plaintiff and Epps met with Chief Operations Officer Lois Guarino in her office, reported Brzuszkiewicz's ongoing sexual harassment of her to Guarino, and complained of HR's failure to take appropriate remedial action.

173.   In response to Plaintiff's protected activities as above, Defendant discriminated

and/or retaliated against Plaintiff by through materially adverse actions including, but not limited

to:

- Repeatedly directing Plaintiff to leave campus and/or suggesting that she move her housing to another location.

- Repeatedly telling Plaintiff: "We don't have time for this."

- Failing and refusing to act on Plaintiff's undisputed allegations of sexual harassment, even after Brzuszkiewicz had breached his "progressive discipline" guidelines.

- Failing and refusing to discipline Brzuszkiewicz for his undisputed sexually harassing conduct toward Plaintiff.

- Constructively discharging Plaintiff.

- Interfering with Plaintiff's obtaining a protective order from the police by refusing to disclose files and documents relating to its investigation into Plaintiff's complaints of Brzuszkiewicz's sexual harassment.

174.    Such actions would be reasonably likely to deter an employee in Plaintiff's position from making or supporting a charge of discrimination.

175.    Plaintiff engaged in the foregoing protected activities between April and August, 2014, and Defendants' adverse conduct took place between June, 2014 and December 2014, which supports an inference of retaliation.

176.    Defendant's actions and comments show a causal connection between such complaints of sexual harassment and the materially adverse employment actions with regard to Plaintiff.

177.    As a consequence of its actions, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, attorney's fees, costs and disbursements in this action.

## THIRD CLAIM
### (NYSHRL – Sex Discrimination)

178.    Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

179.    As a woman, Plaintiff is a member of a class protected by New York State Executive Law § 296(1)(a) ("NYSHRL").

180.    Defendant discriminated against Plaintiff on the basis of sex, in violation of NYSHRL, including but not limited to creating and maintaining a sex-based hostile work

environment, by failing and refusing to take appropriate remedial action in response to Plaintiff's numerous reports of sexual harassment.

181.    Such hostile work environment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

182.    Such hostile work environment constituted a constructive discharge.

183.    By failing and refusing to take appropriate remedial action, Defendant ratified and condoned the perpetrator's behavior, effectively giving him permission to continue.

184.    As a result of such condonation, *inter alia*, the perpetrator followed Plaintiff back to Brooklyn, New York, where he has continued to stalk and harass her up to the present.

185.    As a result of Respondent's unlawful discriminatory actions, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

186.    As a consequence of its actions, Defendant is liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, costs, disbursements in this action.

## FOURTH CLAIM
### (NYSHRL – Retaliation)

187.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

188.    Defendant, through its managerial employees and agents, retaliated against Plaintiff on the basis of her protected activities in the terms and conditions of her employment in violation of New York State Executive Law § 296(1)(a) ("NYSHRL").

189.    Plaintiff opposed discrimination pursuant to NYSHRL by actions including, but to limited to, the following:

- On or about June 17, 2014, Plaintiff reported Brzuszkiewicz's sexual harassment of her to her supervisor, Omega Staff Manager Turner Dubler.

25

- On or about June 17, 2014, Plaintiff reported Brzuszkiewicz sexual harassment of her directly to HR.

- On or about July 1, 2014, Plaintiff reported to HR that Brzuszkiewicz had violated the progressive discipline guidelines allegedly given to him by Defendant by spreading sexual rumors about her to other staff members.

- On or about July 1, 2014, Plaintiff emailed HR, protesting their lack of urgency in responding to her repeated complaints of sexual harassment by Brzuszkiewicz.

- On or about July 2, 2014, Plaintiff met with HR in the HR office to report in greater detail the circumstances of Brzuszkiewicz's violation of the progressive discipline guidelines allegedly given to him by Defendant, and to reiterate her prior complaints of sexual harassment by Brzuszkiewicz. During this meeting, Plaintiff turned over to HR the unwanted romantic emails she had received from Brzuszkiewicz including but not limited to those emails he sent even she told him unequivocally to stop contacting her.

- In or about mid-late July 2014, Plaintiff complained again to HR of Brzuszkiewicz's sexual harassment of her.

- Directly after this final meeting with HR, Plaintiff and Epps met with Chief Operations Officer Lois Guarino in her office, reported Brzuszkiewicz's ongoing sexual harassment of her to Guarino, and complained of HR's failure to take appropriate remedial action.

190.    In response to Plaintiff's protected activities as above, Defendant discriminated and/or retaliated against Plaintiff by through materially adverse actions including, but not limited to:

- Repeatedly directing Plaintiff to leave campus and/or suggesting that she move her housing to another location.

- Repeatedly telling Plaintiff: "We don't have time for this."

- Failing and refusing to act on Plaintiff's undisputed allegations of sexual harassment, even after Brzuszkiewicz had breached his "progressive discipline" guidelines.

- Failing and refusing to discipline Brzuszkiewicz for his undisputed sexually harassing conduct toward Plaintiff.

- Constructively discharging Plaintiff.

- Interfering with Plaintiff's obtaining a restraining order from the police by refusing to disclose files and documents relating to its investigation into Plaintiff's complaints of Brzuszkiewicz's sexual harassment.

191.    Such actions would be reasonably likely to deter an employee in Plaintiff's position from making or supporting a charge of discrimination.

192.    Plaintiff engaged in the foregoing protected activities between April and August, 2014, and Defendants' adverse conduct took place between June, 2014 and December 2014, which supports an inference of retaliation.

193.    Defendant's actions and comments show a causal connection between such complaints of sexual harassment and the materially adverse employment actions with regard to Plaintiff.

195.     As a result of Defendant's unlawful retaliatory actions, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

196.     Defendant is therefore liable to Plaintiff for back pay, front pay, physical injury, emotional distress and other compensatory damages, pre-judgment interest, post-judgment interest, costs and disbursements.

## FIFTH CLAIM
### (NYSHRL against Elisabeth Giglio, individually, for Aiding & Abetting Discrimination)

197.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

198.    By her failure and refusal to investigate properly and/or take prompt and effective remedial action as described above in ¶¶ 58–159, Defendant Giglio aided and abetted, or

attempted to aid and abet, the perpetrator in sexual harassing Casanova in such sexual harassment in violation of New York State Executive Law § 296(a)(6) ("NYSHRL").

199.    As a result of Defendant Giglio's unlawful acts, described above, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

200.    Defendant Giglio is therefore liable to Plaintiff for back pay, front pay, physical injury, emotional distress and other compensatory damages, pre-judgment interest, post-judgment interest, costs and disbursements.

## SIXTH CLAIM
**(NYSHRL against Elisabeth Giglio, individually, for Aiding & Abetting Retaliation)**

201.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

202.    By her various wrongful actions as described above in ¶¶ 58–159, Defendant Giglio aided and abetted, or attempted to aid and abet, Defendant Omega in discriminating and/or retaliating against Casanova on the basis of her protected activities in opposing discrimination, in violation of New York State Executive Law § 296(a)(6) ("NYSHRL").

203.    As a result of Defendant Giglio's unlawful acts, described above, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

204.    Defendant Giglio is therefore liable to Plaintiff for back pay, front pay, physical injury, emotional distress and other compensatory damages, pre-judgment interest, post-judgment interest, costs and disbursements.

**SEVENTH CLAIM**
**(NYSHRL against Robert "Skip" Backus, individually, for Aiding & Abetting Discrimination)**

205.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

206.    As the CEO and part owner of Defendant Omega, which failed and refused to investigate properly and/or take prompt and effective remedial action as described above in ¶¶ 58-159, Defendant Backus aided and abetted the continuing sexual harassment hostile work environment and continued stalking of Casanova in violation of New York State Executive Law § 296(a)(6) ("NYSHRL").

207.    In terms of the economic realities of the workplace, Defendant Backus was an individual employer of Plaintiff and other seasonal staff members.

208.    As a result of Defendant Backus' unlawful acts, described above, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

209.    Defendant Backus is therefore liable to Plaintiff for back pay, front pay, physical injury, emotional distress and other compensatory damages, pre-judgment interest, post-judgment interest, costs and disbursements.

**EIGHTH CLAIM**
**(NYSHRL against Robert "Skip" Backus, individually, for Aiding & Abetting Retaliation)**

210.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

211.    As the CEO and part owner of Defendant Omega, which discriminated and/or retaliated against Casanova on the basis of her protected activities in opposing discrimination as

described above in ¶¶ 58-159, Defendant Backus aided and abetted such retaliation in violation of New York State Executive Law § 296(a)(6) ("NYSHRL").

212.    In terms of the economic realities of the workplace, Defendant Backus was an individual employer of Plaintiff and other seasonal staff members.

213.    As a result of Defendant Backus' unlawful acts, described above, Plaintiff has suffered lost wages, emotional distress and other compensatory damages.

214.    Defendant Backus is therefore liable to Plaintiff for back pay, front pay, physical injury, emotional distress and other compensatory damages, pre-judgment interest, post-judgment interest, costs and disbursements.

## NINTH CLAIM
### (FLSA – Minimum Wage Violation)

215.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

216.    The federal minimum wage pursuant to 29 U.S.C. § 206 is and was, at all times relevant, $7.25 per hour, or $290.00 for a 40-hour work week.

217.    However, as a seasonal staff member, Plaintiff was only paid an hourly wage of $2.50 per hour, which is well below the federal minimum.

218.    Defendant Omega reduced the hourly wage of Plaintiff and other seasonal staff members to $2.50 per hour by making deductions for housing and meals.

219.    However, in violation of the FLSA, Defendant Omega did not provide Plaintiff and other seasonal staff members with proper written notice regarding the nature and amount of such deductions.

220.    Section 3(m) of the FLSA permits an employer, under conditions specified in Regulations 29 CFR ¶ 531, to count toward its minimum wage obligations the "reasonable cost" of furnishing board, lodging or other facilities that are customarily furnished to employees.

221.    Defendant Omega paid Plaintiff $100 per week, thereby reducing her minimum wage of $290 for a 40-hour work week by nearly two thirds.

222.    Upon information and belief, Defendant Omega deducted more than the "reasonable cost" for housing and/or meals provided by Defendant Omega from Plaintiff's wages.

223.    Furthermore, the "housing" Defendant Omega provided to Plaintiff in order to reduce her wages consisted of a small trailer without regular access to heat and/or electricity.

224.    Defendant Omega's failure to comply with federal law regarding the minimum wage caused Plaintiff to suffer lost wages, in an exact amount to be determined.

225.    Therefore, Defendant Omega is liable to Plaintiff in the amount of her unpaid wages, attorney's fees, pre-judgment interest, post-judgment interest, costs and disbursements.

## TENTH CLAIM
### (FLSA – Willful Violation)

226.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

227.    Pursuant to FLSA § 216, Plaintiffs are entitled an additional amount equal to 100% of their unpaid wages, as liquidated damages for willful violations on the part of the employer.

228.    Defendant Omega willfully violated FLSA in that it knew or should have known of its obligation to comply with federal law by paying the federal minimum wage; Defendant

Omega has acted with reckless disregard for Plaintiff's right to minimum wages under the FLSA, and for Defendant Omega's corresponding duty to provide such wage.

229.    Therefore, Defendant Omega is liable to Plaintiff an additional amount equal to 100% of her unpaid wages, as liquidated damages.

## ELEVENTH CLAIM
### (NYLL – Minimum Wage Violation)

230.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

231.    The New York State minimum wage pursuant to NYLL § 652 was, at all times relevant, $8.00 per hour, or $320.00 for a 40-hour work week.

232.    However, as a seasonal staff member, Plaintiff was only paid an hourly wage of $2.50 per hour, which is well below the state minimum.

233.    Defendant Omega reduced the hourly wage of Plaintiff and other seasonal staff members to $2.50 per hour by making deductions for housing and meals.

234.    However, in violation of NYLL § 142-2.5, Defendant Omega did not provide seasonal staff members with proper written notice regarding the nature and amount of such deductions.

235.    Pursuant to NYLL § 142-2.5, the maximum daily housing value was, at all times relevant, $3.40 per day; for a seven-day week, that maximum allowable housing deduction from Plaintiff's wages for the trailer provided Defendant Omega provided to her was $23.80.

236.    Furthermore, the "housing" Defendant Omega provided to Plaintiff in order to reduce her wages consisted of a trailer without regular access to heat and/or electricity.

237.    Pursuant to NYLL § 142-2.5, the maximum meal value was, at all times relevant, $2.75 per meal; for 21 meals per seven-day week, the maximum allowable deduction from Plaintiff's wages for meals provided by Defendant Omega was $57.75.

238.    Upon information and belief, Defendant Omega deducted more than the maximum allotted value for housing and/or meals from Casanova's wages.

239.    Defendant Omega paid Plaintiff $100.00 per week, thereby reducing her minimum wage of $320.00 for a 40-hour work week by more than two thirds.

240.    For each employee including Plaintiff whose wage was reduced by Defendant Omega to $100 for a 40-hour work week after deductions for housing and meals in excess of $81.55, Defendant Omega owes unpaid wages in the amount of no less than $138.45 per week.

241.    Defendant Omega's failure to comply with New York State law regarding the minimum wage caused Plaintiff to suffer lost wages, in an exact amount to be determined.

242.    Therefore, Defendant Omega is liable to Plaintiff in the amount of her unpaid wages, attorney's fees, pre-judgment interest, post-judgment interest, costs and disbursements.

## TWELFTH CLAIM
### (NYLL – Willful Violation)

243.    Plaintiff repeats, realleges and reincorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

244.    Pursuant to NYLL § 198, Plaintiffs are entitled an additional amount equal to 100% of their unpaid wages, as liquidated damages for willful violations on the part of the employer.

245.    Defendant Omega willfully violated NYLL in that it knew or should have known of its obligation to comply with New York State Labor Law by paying the state minimum wage;

Defendant Omega has acted with reckless disregard for Plaintiff's right to minimum wages under the NYLL, and for Defendant Omega's corresponding duty to provide such wage.

246.   Therefore, Defendant Omega is liable to Plaintiff an additional amount equal to 100% of her unpaid wages, as liquidated damages.

**WHEREFORE,** Plaintiff Casanova seeks a judgment granting her the following relief against Omega Institute for Holistic Studies, Inc.:

**On the First and Second Claims (Title VII Discrimination and Retaliation):**

(a) an order declaring that the acts and practices complained of herein are in violation of Title VII of the Civil Rights Act of 1964;

(b) an order enjoining and permanently restraining these violations of Title VII of the Civil Rights Act of 1964;

(c) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

(d) compensatory damages for physical injuries and emotional distress;

(e) punitive damages;

(f) attorney's fees;

(g) pre-judgment interest;

(h) post-judgment interest; and

(i) costs and disbursements of these actions; and

(j) such other relief as this court deems just and proper.

**On the Third and Fourth Claims (NYSHRL Discrimination and Retaliation):**

(a) an order declaring that the acts and practices complained of herein are in violation of the

34

New York State Human Rights Law;

   (b) an order enjoining and permanently restraining these violations of the New York State Human Rights Law;

   (c) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

   (d) compensatory damages for physical injuries and emotional distress;

   (e) pre-judgment interest;

   (f) post-judgment interest; and

   (g) costs and disbursements of this action; and

   (h) such other relief as this court deems just and proper.

**On the Fifth and Sixth Claims (NYSHRL against Defendant Giglio, individually):**

   (a) an order declaring that the acts and practices complained of herein are in violation of the New York State Human Rights Law;

   (b) an order enjoining and permanently restraining these violations of the New York State Human Rights Law;

   (c) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

   (d) compensatory damages for physical injuries and emotional distress;

   (e) pre-judgment interest;

   (f) post-judgment interest; and

   (g) costs and disbursements of this action; and

   (h) such other relief as this court deems just and proper.

**On the Seventh and Eighth Claims (NYSHRL against Defendant Backus, individually):**

   (a) an order declaring that the acts and practices complained of herein are in violation of the New York State Human Rights Law;

   (b) an order enjoining and permanently restraining these violations of the New York State Human Rights Law;

   (c) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

   (d) compensatory damages for physical injuries and emotional distress;

   (e) pre-judgment interest;

   (f) post-judgment interest; and

   (g) costs and disbursements of this action; and

   (h) such other relief as this court deems just and proper.

**On the Ninth Claim (FLSA Minimum Wage Violation):**

   (i) an order declaring that the acts and practices complained of herein are in violation of the Fair Labor Standards Act;

   (j) an order enjoining and permanently restraining these violations of the Fair Labor Standards Act;

   (k) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

   (l) costs and disbursements of this action; and

   (m) such other relief as this court deems just and proper.

**On the Tenth Claim (FLSA Willful Violation):**

(a) an additional amount equal to 100% of their unpaid wages, as liquidated damages for willful violations on the part of the employer; and

(b) such other relief as this court deems just and proper.

**On the Eleventh Claim (NYLL Minimum Wage Violation):**

(a) an order declaring that the acts and practices complained of herein are in violation of the New York Labor Law;

(b) an order enjoining and permanently restraining these violations of the New York Labor Law;

(c) back pay and front pay in the amount of lost wages including wage increases and other benefits of employment;

(d) pre-judgment interest;

(e) post-judgment interest; and

(f) costs and disbursements of this action; and

(g) such other relief as this court deems just and proper.

**On the Twelfth Claim (NYLL Willful Violation):**

(a) an additional amount equal to 100% of their unpaid wages, as liquidated damages for willful violations on the part of the employer; and

(b) such other relief as this court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
November 9, 2015

Respectfully submitted,
LAW OFFICES OF GAIL I. AUSTER
AND ASSOCIATES, P.C.

By: Gail I. Auster
17 Battery Place, Suite 711
New York, NY 10004
Telephone: 212.864.3461
Cell: 914.707.4000
Facsimile: 212.864.2228

# EXHIBIT 1

EEOC Form 161-B (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Nicole Casanova<br>251 North 8th Street<br>Brooklyn, NY 11211 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2015-02490 | Jessica A. Erdman, Investigator | (212) 336-3749 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Kevin J. Berry,
**District Director**

08/07/15
(Date Mailed)

Enclosures(s)

cc:
Attn
Director of Human Resources
OMEGA INSTITUTE FOR HOLISTIC STUDIES, INC.
150 Lake Drive
Rhinebeck, NY 12572

Chloe Liederman, Esq.
LAW OFFICES OF GAIL I. AUSTER & ASSOCIATES, P.C.
17 Battery Place, Suite 711
New York, NY 10004

U.S. EQUAL EMPLOYMENT OPPORTUNITY CC. 'MISSION
New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

UNITED STATES POSTAGE
PITNEY BOWES

02 1P          $ 000.485
0000806097     AUG 10 2015
MAILED FROM ZIP CODE 10004

Chloe Liederman, Esq.
LAW OFFICES OF GAIL I. AUSTER & ASSOCIATES, P.C.
17 Battery Place, Suite 711
New York, NY 10004

10004$1126  CC94